and if Mr. Levine and Mr. Zussman can just come on and let us know their audio is working. Hello, Your Honor. This is Michael Levine and my audio is working. Ms. Zussman? Yes, Your Honor. This is Kelly Zussman and hopefully my audio is working. Yes, yes. Right. And Mr. Levine, it's great to see you again after all these years. Your Honor, I think it's about, I was trying to figure, I think it's about 30 and I can say we're both getting better looking. That's all I can say. Well, Mr. Levine, I would advise you not to start your argument with a false statement. You may be getting better looking, but the second part of your statement is clearly not correct. All right. I will amend it to say we're all getting better looking, everybody on this panel. Now, the first issue I'd like to address is the district courts. I'm going backwards a little bit. The district court's failure to resolve the objections to the pre-sentence report. They were clear and specific objections. The district court's failure to resolve them violated Rule 32 of the federal rules and this court's case law, many cases. Were those objections reiterated at sentencing? Not per se, except with respect to the objection to the rape of Hallman, the defendant himself did at the sentencing. He spoke up and said, I didn't rape anybody. That's at page 1424. So with the rape of Hallman, yes, it was reiterated by the defendant himself. And the rape of Hallman was important. It was well, the rape of anyone is a terrible, terrible point. And now the government says, well, the judge never mentioned it. And we don't know that it didn't affect the guidelines. And but the point of Rule 32 is that the judge is supposed to either say, I'm not going to consider it or make a finding. And he didn't either. So we don't know if this affected his decision on the extent of his downward departure. For example, it may not have affected the guidelines, but he did grant a downward departure. But what do you have granted? What have you done more? What have you gone lower? We don't know. And nobody on this panel will know. That's why we have Rule 32. This is Judge Pearson. The judge did pay quite a bit of attention to articulating his reasoning under the guise of 3553A. Yes. Isn't it fair to believe that if he'd taken any of the unresolved objections into consideration, it might have been stated then, or even if unstated, given the clear articulation under 3553A considered? I respectfully disagree, Your Honor, because Rule 32 is very clear. This court's and bank decision in Fernando's Angulo years ago, and in a case I litigated years ago, United States v. Barron out of the District of Hawaii, makes clear that this Rule 32 is strict compliance is demanded. I believe that's the quote from the case. Strict compliance. So regardless of what the judge said with respect to the 3553A, he still had a specific duty to resolve the objections because we're sitting here now not knowing if his sentence, if he considered this at all in his downward departure sentence. It's just the state of the record is such as we just don't know. And United States v. Carter, that I cited in my brief, makes that point. There's just no way to know. That's why we have the rule. But this is on plain error. So don't you have, isn't it your burden to show an effect on substantial rights resulting from this error? Well, Your Honor, I disagree. It's not plain error. The objection was made, the defendant filed objections to the pre-sentence report. That's all that Rule 32 requires. Rule 32 does not require repeating the objection at sentencing. I know of no Ninth Circuit case law that requires that. Now the government cites United States v. Christensen, but Christensen does not say that the defendant has to repeat the objections at the sentencing procedure. And which paragraphs of the pre-sentence report did the defendant object to in writing? He objected to ER 161. It's paragraph of pre-sentence report 37, but his objection letter can be found at excerpt of record 61. As a matter of fact, the government argued that he objected to too many things. Didn't he basically in writing object to everything? Well, not to everything, but he objected to a lot, which was his right. I mean, he can object to it. I don't know of no law that says you can't object. There's a limit to what you can object to. But only the defendant raised one at the actual sentencing. Yes, he raised one at the actual sentencing, but it was an important one. And so putting that for the moment aside, though, your view is that if you object to every paragraph of the pre-sentence report in writing before sentencing, but don't mention any of the match sentencing, the district court still has an obligation to explicitly resolve every one. No, only certainly important ones, certainly ones that are material. Obviously, if he says I object to the jersey being red and it was black or object to the suit or object to the blue eyes. But no, we have to be a rule of reason. If it's an objection going to a material point, and these are, for example, he objected to the rape, which was certainly an important factor. He objected to the fact that there were supposedly over 40 victims. This was objected to very strongly. He said no. It was very clear the objection the judge had to make. The government argued there were over 40 victims in its sentencing memorandum. The defendant objected to that. The judge had to resolve that because that can make a big difference on how many victims there were. The abortion question was there was an objection that he objected to the claim in the PSR that he had urged Princeton to get an abortion. And he objected to that. That was it. That's important. We don't know how a lot of people have very strong feelings justifiably about abortion. The judge may have, the jurors may have, but leave the jurors aside. I'm talking about the judge now with sentencing. We don't know how he reacted to hearing that someone is urging abortion, which many people can see, believe is urging murder of a fetus. And some people have been killed for performing abortions. We have Ninth Circuit case law talking about how volatile that kind of a subject is. So the judge had to, in my view, had a duty to make a finding, and he did not. So let me ask this to be clear. When the hearing concludes and the judge asked both sides that there's an objection to the sentence imposed, there's no doubt that there was some question of that sort and answers given, right? I'm sorry. I misunderstood your question, Your Honor. The question about whether or not there was an objection to the sentence imposed. Well, the Supreme Court has recently held that you don't have to object again to the sentence that's imposed. I forget the name of the case. Well, but my point is that would be the time. And I say this to be more colorful than accusative. You can't blindside a judge later and say you didn't rule on my objections when you stood before the judge and didn't say, well, yes, I object because you didn't resolve this objection or that objection. Because, again, let me just finish this thought because your answer is going to be helpful to me. I think when the judge articulated under the categories of 3553A, the judge believed that he was wrapping up the justification for the sufficient, not greater than necessary sentence, all objections included. And I'd like to know why you don't find that satisfactory despite Rule 32. Well, first of all, I don't have I don't know that the record actually states. I'm sure the court has it fairly accurate, but I don't have it in front of me. But in any event, when the objection is made to the PSR saying that the rape of Hallman did not occur, we object to it. And then the defendant himself at the sentencing during his colloquy, when this is his final statement to the court pleading for mercy. When he says, I didn't rape anybody. The judge at that point. Yes. At that point, the judge has to have a has to say, I'm resolving this issue that that was an objection you made to the PSR. You're denying it. I'm going to say I find you did rape Hallman and that or he's going to say whether you raped Hallman or not, that's not going to play a part in my sentencing. I'm sentencing you to blank, so I'm not going to reach the decision of whether you raped Hallman. That's what Rule 32 requires one or the other. And here there was neither in the face of a specific denial by the defendant that he had raped Hallman and a specific denial by his attorney in the objections to the PSR that he had raped Hallman. So in those circumstances, the judge had a duty to resolve the question or to say it's not going to play any part. I'm not doing that. He violated Rule 32. Next, I would like to go to the selective enforcement issue only to point out that we have new law now in this circuit, United States versus sellers. And again, I'm reminding the court the court is aware this isn't a question of whether the case should be dismissed because of selective enforcement. It's a question of whether discovery should be ordered to allow the defendant to fully prepare a motion to dismiss. So the question is, counsel, so even if I were even if we were to grant that, the motion that was filed in the district court should be looked at as a selective enforcement motion instead of a prosecution moment. Yes. And moving beyond that for the moment, reading sellers, the court said, we hold that in these stash house reversing cases, claims of selective enforcement are governed by a less rigorous standard than that applied to claims of selective prosecution under Armstrong. And the court makes a statement almost just like that two or three other times. So why, if we were to reach the question, would we hold that sellers applies to every selective enforcement case as opposed to reverse stash house cases? Well, this goes back to holding and ratio dissidentity, I believe, was the Latin phrase from law school. What is the reasoning of the court? Yes. But specific holding on the facts of the case was a reverse stash house. But when we look at how the court reasoned and reached that conclusion, the court is saying that you have to distinguish prosecutors, U.S. attorneys, prosecutors, their decisions from law enforcement agents to the former. We owe this difference. They're wonderful people. They make no mistakes. They're perfect. But the law enforcement people know they're attacked all the time by defense counsel. They make the decisions on not just who to arrest, but what they urge the prosecutors to charge. Are they going to take it to state court? Counsel, even if I agreed with you that we look at the reasons instead of the holding. When I read sellers, I see them saying the rigorous discovery standard of Armstrong doesn't apply strictly to discovery requests in selective enforcement claims like sellers. And I read the court talking about how the circumstances are different. We're in a reversing operation. You're targeting particular people. And so even if one looked at the rationale, I see the rationale is dependent upon the type of case in sellers, which the court had a particular type of issue with. I understand how the court is reaching its conclusion. I read the case somewhat more broadly and somewhat differently. And I'll move on to the next issue because I don't know if I'm going to be able to persuade the court as to my reading of the case. But I do think it can be read more. I think it's a fundamental change in the law. I think it extends beyond stash houses. It extends to claims of it's distinguishing what the agents do from what prosecutors do. And yes, it's the agents here in a stash house. But the reasoning can apply to agents in any case where they have to make a decision. Are they going to go to federal court? Are they going to take it to state court? If they go to federal court, are they going to press for this? This draconian life sentence statute? Or are they going to press for a lesser included? Are they going to take them over to state court and press it not be transferred to federal court? But why isn't that? I mean, that seems like a prosecutorial decision. What charges to bring which what court to go to it? How is that an enforcement issue? Ultimately, it is a prosecutorial decision. But how the agents choose to present the case to the prosecutors, if they choose to present it at all to the prosecutors, if they choose to go to state court as opposed to federal court, all those are the decisions of the law enforcement officers. If they choose to let people go, that's a law enforcement decision. It never gets to the prosecutor. I'd like to move to the next issue, which is the unlawful entry into the hotel room. Into the hotel room is treated as a home under Ninth Circuit law. We have the government agent by his own testimony, the way I read it, having one foot in the door. She opens the door, Prinster, she's in a towel, but he puts the agent puts one foot inside. That's an entry. Is there any argument in your opening brief at all on the standing issue? I make an argument that he does have standing. I'm not going to take the time to go through my brief at the moment. But I know that the district judge found there was initial standing. But he said that contrary to the government's argument in its answering brief, the judge found that there was initially standing because he said he'd been there overnight. He also said at the time of the entry, there was no longer a reasonable expectation of privacy in the hotel room because he had overstayed and the hotel had taken affirmative steps to evict him. So why is that wrong? Well, you're right, Your Honor, Judge Miller, you're right. That's what the judge said. But that's wrong because he doesn't lose, contrary to the district judge's conclusion, he doesn't lose standing if eviction is in process. There has to be a lawfully completed eviction. At least that's my reading of the cases that I cited in my brief. Just because they want to evict someone and they're about to evict them and they're in the process of evicting them, that doesn't mean the eviction is completed lawfully. So in my view, he had standing even at that moment, even though I agree they wanted to evict him. But remember, she said, and I don't have the transcript, Prinster said, I had a late checkout. When she first comes to the door, when they first come to the door, Prinster says, I had a late checkout. But she had previously said, or at least the hotel manager, the hotel manager told the police that the hotel had unsuccessfully tried to evict the people from the room. And he also reported that when he followed, I forget the name of the person who, the man, the very tall man who came into the room, that Prinster had said to him, we have to be quick. We were supposed to be out of here by noon. So doesn't that all support the finding that they were aware that the time of legitimate occupancy had lapsed? Yes, but that doesn't still doesn't mean that eviction lawful eviction had been completed. If you look at the cases I cited in my brief, I believe that they stand for the proposition that the eviction has to have been lawfully completed. Yes. These people were supposed to have been out by a certain time. Yes. There may have been a dispute as to whether they were out the hotel, obviously thought they were beyond their stay, but that doesn't mean that you're you're right. The privacy evaporates suddenly just because the hotel thinks you should be out. There has to have been a lawful eviction moving on. And he, the officer entered, it was a without probable cause and without existing circumstances. It was an unlawful entry. Everything should be suppressed after that point. Everything found in that room and moving beyond that. Once they get in the room, he certainly has standing to object to the way he was treated by white officers treating a classic takedown of a black man by white officers who put him in a they didn't put this neck. They didn't put their neck on his knee on his neck like they did to Floyd recently. Instead, they push him up against the bathroom wall. They hold him there for an hour like he's an animal. Now this court should not permit this kind of police misconduct in this day and age when everybody's rioting all over the country, because regardless of what this person is accused of doing, he should be treated like a human being and not like an animal. And the ninth circuit has said, had pointed out that black people are in the receiving end of this and occasionally Hispanic people. This court has a duty to send a message down the government says, well, you know, maybe they made some mistakes. You need a, there's no deterrent message here. There is a deterrent message here. There's only three people that could send that message. That's the three people sitting on this court right now, because there's only one thing the U S attorneys understand. One word prosecutors understand that's reversed. It's the only word they've ever, ever understood. Reversed. Mr. Levine. Did you want to reserve the remainder of your time? Thank you. And we'll, we'll give you a, we'll give you two minutes on, on rebuttal. Thank you, Your Honor. May it please the court Kelly Zoosman appearing on behalf of the United States. I'd like to begin where Mr. Levine ended.  in the past. On the day that Mr. Ford was arrested in 2012, Mr. Levine, both today and in his brief has relied upon facts that are rest upon his own client's testimony at that hearing. Those facts, however, were not what the district court found. And although in his reply brief, he suggested that in fact, a remand was appropriate. Judge Hernandez has already answered that question. This is a footnote to on page four of the district court's opinion. The court made a credibility finding and incorporated that credibility finding into its opinion. So therefore the court did not accept Mr. Ford's description of what happened at the time of his arrest. So if we look at the facts that the district court actually found, the district court found that an eviction was in fact in process. The district court also, I think very importantly found that the officers, when they knocked on the door, had already developed at least reasonable suspicion at that time. Then because events happen very quickly. And also the court found that the officers stayed at the threshold of that door. I believe Mr. Levine told this court that the officers had one foot in the door and there is no evidence in the record to suggest that despite defense counsel's repeated efforts to get these officers to admit that they entered the room, they didn't do so. They stayed at the threshold and judge Hernandez found that everything that happened thereafter was reasonable. Excuse me. Could you address it as a legal matter? What is your understanding of when the reasonable expectation of privacy in a hotel room ends? I mean, it's presumably not one minute past the stated checkout time. So how, how is that assessed? Sure. And I think once the eviction process is underway and part of the, what makes this difficult to apply in this case is that Mr. Ford told the officers that he had just been there for about 15 minutes. So in terms of establishing his reasonable expectation of privacy at the time, I think we've got a good faith argument that the officers did not believe that Mr. Ford had a good faith expectation of privacy. I think the other thing too is I don't want to get too down the rabbit hole of standing because in fact, Mr. Ford was arrested based largely upon the information that was gleaned from TH. And as the, as the panel may recall, it was while they were at the threshold speaking with Mr. Ford and Ms. Prinster that TH emerged from room 211. And it was at that point when they saw this very frightened looking girl, they didn't know if she was a minor. The officers testified that she looked very young, that Judge Hernandez found that that's when this developed into probable cause for arrest. Then the only thing that the officers seized from that hotel room that it was actually admitted at trial was the evidence that was found from Mr. Ford's computer that was seized at the time and then search pursuant to a search warrant. So that's where I'm not sure that standing matters quite so much when the only evidence that was derived from that interaction comes from the computer that was seized once they had probable cause to arrest, which was developed based upon the information that they received from TH. Unless there are any other questions on the suppression issue, I'd like to turn to the sentencing issue. And that really involves what I see as this court's opportunity to perhaps clean up some frayed ends that existed after Way Lin. So Way Lin, as this court is probably aware, involved kind of a distinctive situation in which a defendant pleaded guilty to a single count that charged only a sex trafficking conspiracy. And in fact, his plea agreement noted that there was no mandatory minimum whatsoever. So the court in Way Lin said, look, to figure out whether or not we start with a base offense level of 14 or 34, all we have to do is look at the judgment. Well, if you look at the judgment in this case, and it's at ER 175, it says as to count one, that Mr. Ford was convicted of both sex trafficking conspiracy and sex trafficking in violation of 1591 A and B1. So the guideline here was satisfied. And if this court looks to what the courts have done since Way Lin, so specifically the Third Circuit in Sims and the Eighth Circuit in Carpenter. Counsel, but in your brief, you argued that if Way Lin applies, there are other, as the district court found, that your argument is that the district court still got the actual guideline range correct, right? That's correct. The district court found that Way Lin bound it. That's correct. And so that's why we've presented this court with, I think there are really three different paths in which you can affirm the district judge's guideline computation. So one would be to square Way Lin with Carter and Sims. The other would be to simply accept the district court's findings that, in fact, we start with an offense level 20, and then after you add in all of the additions that are required by guideline 2G1.1, we still get to an offense level 43 and a guideline range of life. So, and then the alternative, the other alternative is you could set aside count one altogether and just focus on the sex trafficking count. So count two, which is a sex trafficking count, which we know begins with a guideline range of 34. If we have five other victims that we add to count two, that gets us back to an offense level of 43. So even if the district court's computation were in error, it was harmless. To be clear, counsel, if we disagree with you about needing five and find that we need six, your argument is that there were six, right? That's correct. There were six named in the indictment and there were six that were addressed extensively in the pre-sentence report. And does the court have any other questions? I know we have a number of issues in this case, and I'm happy to address them. I would be interested in your position as to Mr. Ford violated rule 32 in a way that mandates remand. Sure. And that's where this case was somewhat distinctive in that Mr. Ford, he objected to paragraphs 10 through 50. That is the entire offense conduct section of the pre-sentence report. And you'll find this in the addendum to the pre-sentence report. He objected to virtually everything. And when a defense, this court has recognized that when a defendant objects to everything, then the district judge is not then duty bound to spend an entire week going through line by line making fact findings. So I think as Judge Pearson has recognized, Judge Hernandez here, I think, of course, he was the trial judge. So he sat through the entire round of suppression hearings. He heard all of the testimony at trial. And he made detailed fact findings on the explanation for his sentence. And nowhere did he ever mention either A, the abortion that Konya Prinster testified about at trial, nor did he mention TH's claim about a rape. And of course, this case is about sex trafficking. Mr. Ford was convicted of multiple counts of sex trafficking and witness tampering. There was no suggestion that the court had defined that there was either a rape or that Konya Prinster had been pushed into an abortion. And I would agree with Mr. Levine, that if at sentencing, Judge Hernandez were to have said, oh, well, I'm going to give him 33 years because he raped EH, then that would be a problem. And we would need to have a greater finding. But we simply don't have that here. And to wait until the appeal to say, gotcha, Judge Hernandez, you didn't make a finding, even though we objected to virtually everything in the pre-sentence report, you somehow should have intuited that these issues were more important to us. And that's simply not what preservation is designed to do. And this court has never held district courts to that kind of an exacting standard. Unless the court has any further questions on any of the issues that were briefed, I'm happy to submit. I have no more questions, Judge Miller, Judge Pearson. Thank you. All right, Mr. Levine, we'll give you two minutes. Thank you, Your Honor. Your Honor, the government has argued, as it did in its brief, that the court rejected Mr. Ford's testimony at the suppression hearing. But the court never did that. There's nothing in the court's opinion that says I reject his testimony or I find him unbelievable or I find it incredible. He didn't discuss it at all. And he virtually ignored the issue about whether or not there was an unlawful entry into the room. The government says there's nothing in the transcript. I invite the court to my opening brief at page 28, where I list the last paragraph. I have the transcript sites to where there is testimony of entry. It's ambiguous, but it certainly suggests there was entry. And if the court will allow me to produce further sites, I'll send a letter to the court with specific transcript sites. I believe one of the officers testified his foot was over at or over the door, the door entrance. And in entry cases, that's all it takes. Just a little bit over, it's an entry. The last point I'd like to make is that the court said they have to have at least five. They don't have five, because I've argued that Hanen and Hallman were not victims. That's in my opening brief, that's one of the arguments that they are not qualified as victims under the, as victims are defined under the statute, that they were, they were offered, even under Prinster's testimony, that she asked them to become escorts. That's her word. Now escorts, men and women have escorts for all kinds of things. Yes, many times that leads to prostitution. It's an escort, but not necessarily. So they did not satisfy the statutory term for being victims. And not only that, one of them was already a prostitute before she even got there. So that's all I have to say, Your Honor. All right. We thank counsel for their helpful arguments and this case will be submitted. And that brings us to our final case to be argued today, Association of Irritated Residents versus the EPA.
judges: Pearson, Bennett, Miller